IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:12-cr-62 |
| | ) | |
| AMY HUNTER, | ) | Hon. Anthony J. Trenga |
| | ) | |
| Defendant. | ) | Hearing Date: October 11, 2012 |
| | ) | |

## MEMORANDUM OPINION

### I. Overview

On April 26, 2011, a nine month old child, referred to in this case as C.P., was taken to

the hospital with injuries later determined to have resulted from "shaken-baby" syndrome. She

died from those injuries on April 28, 2011. At the time C.P. was injured she was in the custody

of defendant Amy Hunter ("Hunter" or "Ms. Hunter"), who was providing child care at her

residence at the Quantico Marine Base in Quantico, Virginia. On October 17, 2011, Hunter was

arrested for murder in the second degree for the death of C.P. Arrest Warrant, Doc. No. 5.

On February 14, 2012, the defendant was indicted for death eligible, first degree murder

[Doc. No. 21]. On May 18, 2012, the Court was advised that the Department of Justice had

decided not to seek the death penalty [Doc. No. 31]. On October 4, 2012, a superseding

indictment was returned charging the defendant with (1) first degree murder; (2) second degree

murder, 18 U.S.C. §1111(a) & (b); and (3) abuse and neglect of children, VA Code 18.2-371.1

[Doc. No. 49]. On October 4, 2012, the government voluntarily dismissed count 1, charging first

degree murder.

In response to the original indictment the defendant filed a Motion to Suppress Defendant's Statements [Doc. No. 33] on August 3, 2012, and a Supplemental Motion to Exclude Defendant's Statements [Doc. No. 46] on September 24, 2012 (collectively referred to as the "Motions"). Included as exhibits to the Motions are video recordings of the defendant's interview on April 27, 2012, with Special Agent Andrea David of the Naval Criminal Investigative Service ("NCIS") at Quantico, and also the defendant's re-enactment of how C.P. was injured, performed in her home on April 27, 2012, at the request of Agent David. The Motions were effectively renewed following the issuance of the superseding indictment. The Court held an evidentiary hearing on the Motions on October 11, 2012, following which the Court took the Motions under advisement.

Defendant's Motions seek to suppress her statements made at the NCIS office on April 27, 2011, on the grounds that they were made in the absence of *Miranda* warnings and were not voluntary, both in violation of the Fifth Amendment, and that any probative value is substantially outweighed by the risk of unfair prejudice pursuant to Rule 403 of the Federal Rules of Evidence. In addition, the defendant seeks to suppress the video recorded re-enactment of the incident, principally pursuant to Rule 403 on the grounds that any probative value of the re-enactment is outweighed by its unfair prejudicial effect. Upon consideration of the Motions, the memoranda and exhibits in support thereof, and the government's oppositions thereto [Doc. Nos. 35 & 47], as well as the testimony, evidence, and arguments made and presented during the October 11, 2012, hearing, and for the reasons set forth below, the Court DENIES the Motions as to the video recorded and written statement given at the NCIS office on April 27, 2011, and GRANTS the Motions as to the video re-enactment.

## II. FACTS[1]

On the morning of April 26, 2011, Defendant Hunter called 911 requesting help for C.P. because, according to the defendant, the infant had fallen, knocked her head against a chair rail, and was unconscious. Mot. to Suppress Hr'g Tr. ("Hr'g Tr.") 10:23-11:3, Oct. 11, 2012, Doc. No. 70. The case was assigned that day to Special Agent David.

Accompanied by Child Protective Services ("CPS") Investigator Matt Hampton, Agent David went to the defendant's home to discuss the incident that had occurred that morning. When they arrived at the house, Agent David introduced herself and with the defendant's permission she and Investigator Hampton conducted a forty minute interview. At the end of the conversation, Agent David and Investigator Hampton left the defendant's home without making any accusations or placing any restrictions on her.

Agent David spent much of the following day, April 27, 2011, communicating with personnel at the hospital, including a child abuse expert that the hospital had brought into the case to determine the extent and possible causes of C.P.'s injuries. Through these conversations Agent David learned that C.P. had multiple skull fractures caused by repetitive head injury, consistent with a shaken baby, and a rib fracture that was approximately three weeks old. She also interviewed the defendant's husband, Michael Hunter, a member of the U.S. Marine Corps on active duty at Quantico.

Later that day, Agent David spoke with an Assistant United States Attorney ("AUSA") for the Eastern District of Virginia to inform that office of what she had learned about the likely

---

[1] The facts stated herein are drawn from: (1) the video recordings of the interview and re-enactment on April 27, 2011; and (2) the testimony and other evidence presented on October 11, 2012 at the hearing on the Motions [Doc. Nos. 33 & 46]. The facts stated herein are solely for the purpose of deciding the Motions.

source of C.P.'s injuries and her intention to question the defendant a second time. Agent David also discussed how she should proceed with her interview, including whether she needed to give *Miranda* warnings to the defendant. During this conversation, Agent David told the AUSA that she did not believe the defendant's story about how C.P.'s injuries occurred and that she suspected that Hunter was responsible for those injuries. The AUSA told Agent David that her follow-up interview with Hunter was "to be made completely voluntary." Hr'g Tr. 20:14-16. Agent David was instructed not to arrest Hunter and that no matter what Hunter said during the follow-up interview she was to be released once the interview concluded. With respect to *Miranda* warnings, Agent David was told that she did not need to read Hunter her rights "as long as it was clear to her from the onset that she was there of her own volition and that no matter what she said, I [Agent David] was releasing her to her own recognizance afterwards." *Id.* at 49:15-18. In addition, Agent David had been told by her "management team" to do a full search of the Hunter residence and was therefore working on getting permission from the base commanding officer to search the Hunters' home.

Around 7:00 p.m. or 8:00 p.m. on April 27, 2011, Agent David called Hunter and asked if she would be willing to come to the NCIS office to talk to her (Agent David). According to Agent David, she proposed that the interview take place at her office (without telling Hunter why) in order to more easily facilitate the preparation of a written statement, should Hunter be willing to provide one, and also to videotape the interview in accordance with the "standard protocol for any violent crimes." *Id.* at 21:5. In response to this request, Hunter agreed to come to the NCIS office, but said that she was busy at that moment and she would come down as soon as she could.

4

Hunter arrived at the NCIS office around 8:10 p.m. and was accompanied by her husband, Michael. The Hunters waited in the NCIS office lobby for approximately twenty minutes until Agent David met with them. Before taking Hunter to the interview room, Agent David asked if she could speak with Hunter outside the presence of her husband. After the Hunters agreed, Agent David escorted Ms. Hunter to the interview room. While waiting in the lobby, the Hunters would likely not have seen any agents in uniform or carrying any weapons.

Upon entering the interview room, Agent David asked Ms. Hunter if she was physically comfortable where she was seated, thanked her for coming in, and told her that "you don't have to be here if you don't want to, but we do have some follow-up questions that we'd like to get from you, if that's all right?" Draft Tr. of Interrogation ("Draft Tr.") 2:3-7, April 27, 2011. Hunter did not verbally respond, but appeared calm and affirmatively nodded her head. Before beginning the interview, Agent David did not ask Ms. Hunter to give up her cell phone or any other personal belongings. During the interview, Agent David was not in a uniform and was not carrying a weapon.

Agent David began the interview by informing Hunter that C.P. "may be brain-dead or on her way to being brain-dead." *Id.* at 2:11-12. She also told Hunter that a child abuse expert who had evaluated C.P. said that a fall could not have caused such serious injuries, but rather, C.P. was probably shaken right before she lost consciousness. *Id.* at 2:13-21. Almost immediately, Hunter became visibly upset and began affirmatively nodding her head in response to Agent David's statement that she and Investigator Hampton needed to speak with Hunter to find out exactly what happened.

For the first few minutes of the interview, Hunter continued to repeat the sequence of events that she had previously told Agent David and Investigator Hampton, but shortly thereafter

admitted she had lied about C.P.'s hitting her head on a chair rail, now claiming that C.P. had hit her head by falling down the stairs. *Id.* at 3:3-5:23. Approximately seventeen minutes into the interview Agent David excused herself but just before leaving the room with Investigator Hampton, Hunter asked if she could see her husband. Agent David responded "can you give us just a second? Do you mind?" and Hunter can be seen affirmatively nodding her head. Video Recording of the Interrogation ("Video") 20:49, April 27, 2011. Shortly thereafter, Mr. Hunter entered the room, took the defendant's hand and told her to calm down, and began asking her what happened. Video 20:53. When Ms. Hunter said she did not know how many stairs Chelsea had climbed before she fell because she (Ms. Hunter) was in the bathroom, Mr. Hunter turned and looked at Agent David and said "that would explain the higher fall, definitely[,]" and Agent David agreed that this was "a much better version of events." Video 20:54. Mr. Hunter then said that this explanation was more "understandable than clunking your head on a chair." *Id.* At this point, Agent David asked Ms. Hunter if she could "go over a few more things with you? Can I kick your husband out one more minute and talk to you for a few more minutes? If that's all right?" *Id.* at 20:55. Ms. Hunter began to affirmatively nod her head as soon as Agent David began asking these questions. After Mr. Hunter left the room but before Agent David resumed questioning she asked Ms. Hunter "you okay to talk for a few more minutes? Is that all right?" *Id.* Again, Ms. Hunter affirmatively nodded her head. *Id.*

Throughout the interview, Agent David challenged Hunter's version of events and pressed her to disclose what had happened. As Agent David conceded, she "downplayed the severity of the incident" and, central to the defendant's Motions, repeatedly assured Ms. Hunter that: (1) she (Agent David) did not believe Ms. Hunter intended to harm C.P.; (2) every parent had been in the defendant's position and that no one would "fault" her; and (3) what happened

6

was simply a "tragic accident." Doc. No. 33, at 2. Agent David and Investigator Hampton both also told Ms. Hunter that C.P. was still alive, that "the doctors needed to know exactly what happened," and that by telling the truth she (Ms. Hunter) "can make this right." Draft Tr. 20:5-21.

At this point, Hunter again asked for her husband. Agent David and Investigator Hampton tried to convince Hunter to first answer their questions and tell them what happened, saying "right now in this room, us three, I'm going to be honest, it's probably going to be the easiest right now" and "I'd really appreciate it if you'd just let us know what's going on, then we'll get him and then you can talk to him." Video 21:03. After it became clear that Hunter would not speak further without having her husband present (around thirty to forty seconds) Agent David told Hunter she would get her husband but "I'd like you to tell us what happened when we get him, is that all right?" *Id.* at 21:04. There was no visible response to this question by Hunter.

When Mr. Hunter re-entered the room he took his wife's hand and urged her to "tell the truth." *Id.* at 21:05. For the next thirteen minutes Agent David and Ms. Hunter discussed the events of April 26, 2011. During that time, Ms. Hunter admitted that C.P. did not fall down the stairs, but rather tired and frustrated by C.P.'s constant crying, she (the defendant) shook C.P. to quiet her down. Ms. Hunter also admitted that C.P.'s head struck either the wall or thermostat when she was shaken, although she did not know how many times she shook C.P. or exactly where/or what C.P.'s head hit.

Following these admissions, the Hunters remained at the NCIS office for another hour and a half, during which time Agent David prepared a written statement, which Ms. Hunter reviewed, corrected, and signed. After returning to the interview the second time, Mr. Hunter

7

remained in the interview room with his wife for the duration of their time at the NCIS office. Throughout the interview Ms. Hunter was provided tissues and water, and was asked several times if she needed anything. Agent David also asked the defendant if, following the interview, she would re-enact how C.P. was injured at her home, and the defendant agreed. Before departing the NCIS office, Agent David took Ms. Hunter's fingerprints and photograph.

After departing, the Hunters, Agent David, and a second NCIS agent all went to the Hunters' home for Hunter to re-enact how the incident occurred. Hunter used a toy baby doll to re-enact the sequence of events that led up to her shaking C.P. During the re-enactment, Agent David told the defendant that that she did not need to spend the actual amount of time she engaged in each of the events leading up to her shaking C.P. (e.g., ten minutes to feed C.P., five minutes in the bathroom, etc.). For these reasons, the events that actually took approximately twenty to twenty-five minutes on the morning of April 26 are re-enacted in the video in less than three minutes. Following the re-enactment, Agent David and her colleague left the Hunters' home and no further restrictions were placed on Ms. Hunter until she was arrested on October 17, 2011.

### III. STANDARD OF REVIEW

Whether statements were unconstitutionally obtained is a mixed question of law and fact properly disposed of by the court, without the assistance of a jury, based on the totality of the circumstances. *U.S. v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005); Fed. R. Crim. P. 12(b)(3)(C), 12(d); Fed. R. Evid. 104(a); *Hasan*, 747 F. Supp. 2d 658-59 (quoting *U.S. v. Wertz*, 625 F.2d 1128, 1134 (4th Cir.1980)). The Government bears the burden of proving, by a preponderance of the evidence, that a statement was voluntary. *See U.S. v. Braxton*, 112 F.3d 777, 786 (4th Cir.1997).

## IV. ANALYSIS

A. Whether the defendant was entitled to receive a *Miranda* warning.

The defendant was entitled to receive a *Miranda* warning only if she was subjected to an "interrogation" while "in custody."[2] Here, there is no question that the defendant was subjected to an "interrogation." See *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980) (for the purposes of a *Miranda* inquiry, "interrogation" refers to both express questioning and "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."); *see also U.S. v. Allen*, 13 F.3d 105, 109–10 (4th Cir.1993). The more difficult issue is whether she was "in custody."

"Custody" is a term of art, limited to circumstances that "present a serious danger of coercion." *Howes v. Fields*, 132 S. Ct. 1181, 1189-90 (2012). A suspect is in custody for *Miranda* purposes when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983). Moreover, because the Supreme Court in *Miranda* was concerned with coercion, a reviewing court must evaluate "custody" by examining the totality of the circumstances surrounding the limitations on the suspect's freedom as a suspect would perceive them. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Berkemer*, 468 U.S. at 437–38. However, the reviewing court should not focus on how

---

[2] The Fifth Amendment provides that "[n]o person shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see U.S. v. Hasan*, 747 F. Supp. 2d 642, 656 (E.D. Va. 2010), *aff'd sub nom. U.S. v. Dire*, 680 F.3d 446 (4th Cir. 2012). In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court declared that a suspect in custody must be advised of his or her rights under the Fifth Amendment prior to any interrogation, because statements made by a suspect in custody are presumptively compelled because of the inherently coercive nature of custodial, or "incommunicado," interrogations. *Accord Dickerson v. U.S.*, 530 U.S. 428, 444 (2000) (reaffirming *Miranda* as a "constitutional rule that Congress may not supersede legislatively").

the suspect *actually* interpreted these facts, but rather on what a *reasonable person* in the suspect's position would have thought knowing the facts available to him. *See Thompson,* 516 U.S. at 112; *Stansbury v. California,* 511 U.S. 318, 323 (1994)). In other words, whether a suspect is "in custody" is an objective inquiry, which focuses on two issues: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. N. Carolina,* 131 S. Ct. 2394, 2401, (2011) (quoting *Thompson,* 516 U.S. at 112). *See also Yarborough v. Alvarado,* 541 U.S. 652, 662–663 (2004); *Stansbury,* 511 U.S. at 323; *Berkemer,* 468 U.S. at 442, and n. 35.

Relevant factors include the location and duration of the questioning, statements made during the interview, the presence or absence of physical restraints during the interview, and whether the suspect was released at the end of the questioning. *Howes,* 132 S. Ct. at 1181. However, not all constraints on a person's movement necessarily amount to a custodial environment for the purposes of *Miranda. Id.* at 1189-90 (stating that a reviewing court should not accord "talismanic power" to the freedom-of-movement inquiry, and that "[o]ur cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."). Likewise, because custody is evaluated objectively, based on how "a reasonable man in the suspect's position would have understood his situation," a "coercive environment" alone does not establish a custodial interrogation. Nor does the fact that the individual questioned is the "'focus of a criminal investigation." *U.S. v. Williams,* 946 F.2d 888 (4th Cir. 1991) (quoting *Davis v. Allsbrooks,* 778 F.2d 168, 171 (4th Cir.1985)); *see also U.S. v. Jones,* 818 F.2d 1119, 1123 (4th Cir. 1987); *Stansbury,* 511 U.S. at 323. For these reasons, the "actual mindset" of the particular suspect subjected to police questioning is

irrelevant. *J.D.B.*, 131 S. Ct. at 2401, 131 S. Ct. at 2401; *see also Alvarado,* 541 U.S., at 668

(officers are under no duty "to consider . . . contingent psychological factors when deciding

when suspects should be advised of their *Miranda* rights."). Similarly, the interrogating officer's

knowledge or beliefs will only bear upon the custody issue if they are conveyed, by word or

deed, to the suspect during questioning, such that they would affect the way in which a

reasonable person in the suspect's position would gauge the breadth of his or her "freedom of

action." *Stansbury,* 511 U.S. at 325 (citing *Berkemer,* 468 U.S., at 440). In sum, the central issue

is whether the environment in which a person is questioned presents the same inherently coercive

pressures as the station house questioning at issue in *Miranda. Howes,* 132 S. Ct. at 1188-89; *see*

*also Beheler,* 463 U.S. at 1122–1123 (defendant not "in custody" during questioning at police

station).

Here, the facts and circumstances pertaining to defendant's interrogation at the NCIS

office both support and undercut the claim that a reasonable person in Ms. Hunter's position

would think she was in custody and not free simply to walk out of the NCIS interview room. On

the one hand, the circumstances reflect the essential aspects of a non-custodial interrogation.

Agent David requested, as opposed to directing or ordering, Hunter to come to NCIS's office.

Hunter came without police escort, prodding, or coercion, accompanied by her husband,

according to her own schedule. Upon entering the interview room and prior to beginning the

interview, the defendant was not placed under arrest or physical restrained. Before beginning her

questioning Agent David informedthe defendant that she "did not have to be there." Draft Tr.

2:3-7. During the interview itself, Agent David periodically asked Hunter if it was "okay" to

proceed with questioning, and at no time did Hunter ask to leave or stop the interview.[3] She was permitted to have her husband join her during the interview when she requested him. She was not asked to relinquish her cell phone or other personal property prior to the interview. Overall, she was at the NCIS office for less than three hours, and her actual interrogation was even shorter. *Compare Allsbrooks,* 778 F.2d at 168 (interview lasting two hours at police station permissible); *with* impermissible interrogation duration in *Ashcraft v. Tennessee,* 322 U.S. 143, 154, (1944) (non-stop for thirty-six hours); *Davis v. North Carolina,* 384 U.S. 737, 752 (1966) (suspect isolated for several weeks); *Chambers v. Florida,* 309 U.S. 227, 235 (1940) (one week). After admitting to shaking C.P., Hunter was released and not arrested until five months later. *See Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (holding that a suspect's consent to be interviewed at the police office, where he was immediately told that he was not under arrest and he was in fact released after confessing to a crime, was not a custodial interrogation requiring *Miranda* warnings); *see also Jones,* 818 F.2d at 1125 (finding that there was not a custodial interrogation when suspects voluntarily came to the police station at the agent's request and the suspects were allowed to leave afterwards).

On the other hand, there were inherently coercive aspects to the interrogation, accompanied by intentional deceptions. The interrogation took place on a military facility, in the office of a criminal investigative unit, by a military law enforcement agent who was known to the defendant to be such. This setting contrasted with the defendant's first interview, which occurred at her residence, and during which Agent David gave no indication that there was any reason not to believe Hunter's version of events. When Agent David called Hunter at her home

---

[3] Agent David testified that if Hunter had said she wanted to stop the interview, or even indicated a desire to stop the interview, she (Agent David) would have stopped the interview. Hr'g Tr. 76:12-22. However, Agent David did not convey this information to Hunter during the interrogation and her unexpressed intentions are therefore irrelevant.

to request a second interview, Agent David did not tell Hunter that, since their first conversation, she (Agent David) had acquired information that called into question the defendant's version of events. Nor did Agent David inform Hunter that she did not have any obligation to speak further with her (Agent David), or that she (Hunter) was not required to come to the NCIS office. As to the interrogation itself, while Agent David told Hunter at the very beginning of the interview that she did not have to be there, the defendant was never explicitly told, either before or after arriving at the NCIS office, that once there, she was not required to participate in an interview or answer questions, or that she was free to leave at any time. Moreover, it was only after Hunter arrived at the NCIS office and was alone in the interview room that Agent David confronted her with the newly obtained information about C.P.'s diagnosed injuries, suggesting that she was responsible for harming C.P. At this point, a reasonable person would have concluded that she would now be treated as someone suspected of criminal wrongdoing. Nevertheless, after this point in time, when a reasonable person would have concluded that law enforcement's view of her had significantly changed since the first interview, there was no indication to Hunter that she remained free to leave or not answer questions. Particularly significant in this regard is that Hunter was never told, as Agent David was explicitly instructed to do by the U.S. Attorney's Office, that she would be released no matter what responses she gave to Agent David's questioning.

There is no question that Agent David believed Hunter had engaged in criminal conduct and that Agent David's actions were intentionally designed to obtain incriminating statements without signaling to the defendant the seriousness of her situation or the jeopardy she faced. Towards that end, and as Agent David candidly testified, Agent David intentionally misrepresented how she viewed the seriousness of Hunter's criminal exposure in order to induce

her to stay and cooperate; and she made a conscious decision not to provide a *Miranda* warning precisely because she knew that it might cause Hunter not to talk or cooperate. Hr'g Tr. 51:12-16. Agent David repeatedly pressed Hunter to reconsider her version of events and gave no indication that the interrogation would end until she obtained the statement she wanted. Rather, Agent David repeatedly emphasized the need to find out "what happened," particularly given C.P.'s critical medical condition and the information that had been received from the doctors. Draft Tr. 2:18-21, 3:1-2, 18:18-21, 20:7-21:16, 22:6-7, & 23:17-19.

The circumstances surrounding the defendant's interrogation cannot be considered separate and apart from her status as the spouse of an enlisted Marine: Hunter lived on post, in military housing, subject to military authorities. A reasonable person in the defendant's position would have no doubt thought about whether her options with respect to cooperating with the NCIS and participating in its investigation were, as a practical matter, restricted because of her location (a military facility), or husband's status (a low ranking member of the military), or her own status (a military spouse living on post). That a person would reasonably perceive aspects of Hunter's situation coercive no doubt explains, at least in part, why, according to Agent David, NCIS would have provided *Miranda* warnings to someone in the defendant's situation, had she been a member of the military.

As inherently coercive as aspects of these circumstances were, and as manipulative and duplicitous as Agent David's conduct was, the Court must conclude that the circumstances surrounding the defendant's questioning did not amount to a custodial interrogation. She was not under formal arrest and she was not otherwise physically or effectively restrained to a similar degree. There was no overt coercion or threats of coercion; there were no physical restraints or threats of physical restraints. She never attempted to leave or stated an interest in leaving. She

was not denied any physical comforts and her husband was present for the majority of her interrogation. There is no doubt that she was subjected to skillful manipulations and deceptions, but the appellate decisions in this circuit and elsewhere permit, and as a result encourage, that kind of conduct.

The defense relies heavily on the fact that Hunter was not explicitly told that she was free to leave or that she did not have to respond to the questions, and that Agent David's conduct suggested that Hunter's only option was to remain in the interview room and continue to answer questions. Doc. No. 46. The Fourth Circuit has made it clear that the failure to tell a suspect that she is not under arrest and/or free to go does not establish a custodial interrogation. *U.S. v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010); *Jones*, 818 F.2d at 1125. The United States Supreme Court has suggested, as recently as February of this year, that under certain circumstances, an explicit statement that a person is free to leave is necessary to make the interrogation non-custodial. *See Howes,* 132 S. Ct. at 1194-95 (Ginsburg, Breyer, & Sotomayor, J., concurring in part, dissenting in part); *see also Mathiason*, 429 U.S. at 494-95 (1977) (citing *Mathis v. U.S.*, 391 U.S. 1 (1968)). But those cases involve situations where a person is already in an institutional custodial setting generally, such as prison, and the warning is deemed necessary to dispel the person's objectively reasonable belief that because he is subject to overall institutional control, he cannot leave but must participate in an interrogation on matters unrelated to the offense for which he is imprisoned. For this reason, the elements of institutional custody present in *Howes* and *Mathis* are too attenuated in the military setting presented in this case to hold that Hunter was entitled to an explicit statement, not otherwise required, that she was free to leave the NCIS office.

For the above reasons, the Court finds and concludes that Hunter was not subjected to a custodial interrogation that required *Miranda* warnings.

B.  Whether the defendant's statements were voluntary.

Even where *Miranda* warnings are not required, a statement, to be admissible, must have been made voluntarily. *Hasan,* 747 F. Supp. 2d 657-58 (citing *Dickerson,* 530 U.S. at 444). Based on essentially the same facts used to support her *Miranda* claim, Hunter claims that in any event her statements did not meet the constitutional measure of voluntariness.

"A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *Braxton,* 112 F.3d at 780. The test for identifying whether a statement is involuntary is if the statement was "'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence.'" *Hutto v. Ross,* 429 U.S. 28, 30 (1976) (quoting *Brady v. U.S.,* 397 U.S. 742, 753 (1970)). A statement will only be deemed involuntary if there is a showing of "coercive police activity." *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *Braxton,* 112 F.3d at 780. Instead, the dispositive factor in a voluntariness inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *U.S. v. Pelton,* 835 F.2d 1067, 1071–72 (4th Cir.1987) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). *See also U.S. v. Dodier,* 630 F.2d 232, 235-36 (4th Cir. 1980) (evaluating the voluntariness of a confession based on whether it is the "product of an essentially free and unconstrained choice by its maker.") When evaluating voluntariness the court should look to "the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the

16

interview, and the details of the interrogation." *Hasan*, 747 F. Supp. 2d 658-59 (quoting *U.S. v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980)). The Supreme Court has noted the following factors as relevant in determining the voluntariness of a statement: the youth of the accused; a lack of education; low intelligence; lack of any advice to the accused of her constitutional rights; the length of detention; repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226. The Fourth Circuit in *Braxton* also identified as appropriate factors to be considered whether the suspect was deprived of anything, and whether the officers used deception. *Braxton*, 112 F.3d at 784-85.

The facts and circumstances in this case establish that Hunter's statements were "voluntary" for constitutional purposes. Though still in her early twenties, the defendant was not a juvenile at the time of C.P.'s injuries or her interrogation. There is no evidence in the record that Hunter lacks education or has low intelligence. Neither Agent David nor Investigator Hampton harmed or threatened to harm Hunter if she did not answer their questions. *See, e.g., Beecher v. Alabama*, 389 U.S. 35, 36 (1967) (statement obtained after police held a gun to suspect's head); *Payne v. Arkansas*, 356 U.S. 560, 564–65 (1958) (statement obtained after police threatened to turn suspect over to an angry mob). Nor did Agent David or Investigator Hampton deprive Hunter of anything. *See, e.g., Malinski v. New York*, 324 U.S. 401, 403, 406–07 (1945) (statement obtained after forcing suspect to remain naked); *Reck v. Pate*, 367 U.S. 433, 441 (1961) (statement obtained after depriving suspect of adequate food, sleep, and contact with family); *Brooks v. Florida*, 389 U.S. 413, 414–15 (1967) (statement obtained after depriving suspect of food and keeping suspect naked in a small cell); *Blackburn v. Alabama*, 361 U.S. 199, 207-08 (1960) (confession obtained after interrogation of eight to nine hours in a "tiny room" that was only "occasionally" lit, but was "literally filled with police officers", and where the

defendant was prevented from seeing/speaking with friends or family). Additionally, the defendant was not subjected to physical conditions that caused discomfort or intimidation.

Of all the facts pertaining to the voluntariness of Hunter's statements, the most concerning are Agent David's intentional efforts to minimize the seriousness of the defendant's criminal exposure, which certainly had the potential to cause Hunter to discount her own assessment of her jeopardy, as evidenced in her initial description of events. The defendant also claims that by making such statements as such as "these things happen, it is okay", "no one is going to fault you for it", "we don't believe you had any intentions of doing it", and "a tragic accident occurred" [Doc. No. 33], Agent David made an "implied promise" that if Hunter were to admit to shaking C.P., she (Hunter) would suffer no punishment. Likewise, the defendant argues that Agent David impermissibly induced her statements by suggesting that she (Hunter) needed to provide accurate details of how C.P. was injured in order to maximize the chances of C.P.'s recovery. Based on these and other statements, the defendant claims that overall, her will was "overborne" by Agent David's tactics and that her "capacity for self-determination was critical impaired," particularly when Agent David allegedly conditioned Hunter's ability to see her husband on her willingness to confess. Doc. Nos. 33 & 46; Draft Tr. 65:1-24. The Court will examine each of these arguments in turn.

1. The existence of an implied promise

In *Hutto*, the Supreme Court reaffirmed the principle that a confession may not be extracted by threats "or obtained by any direct or implied promises, however slight." 429 U.S. at 30 (citations omitted). The breadth of this prohibition notwithstanding, lower courts applying the principles recognized in *Hutto* have found that "[g]overnment agents may initiate conversations on cooperation, they may promise to make a defendant's cooperation known to the

prosecutor, and they may even be able to make and breach certain promises without rendering a resulting confession involuntary." *U.S. v. Shears*, 762 F.2d 397, 401-02 (4th Cir. 1985).

In this Circuit, only certain types of promises, when not kept, will render a resulting confession involuntary. *Id.* These promises are limited to explicit statements by the questioning official that he will do, or not do, a specific act, in exchange for the confession. *Id.* at n.5 (citing *Ferguson v. Boyd*, 566 F.2d 873 (4th Cir. 1977) (finding that repeatedly agreeing to release the defendant's girlfriend if the defendant cooperated was a promise)). Moreover, the cases that have suppressed statements on the basis of an implied promise involve promises that were compelling in terms of the consequences that would befall the defendant or those associated with the defendant. *See e.g., Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (finding impermissible coercion when police threatened to take away the suspect's child if she did not cooperate); *Spano v. New York*, 360 U.S. 315, 323 (1959) (suppressing a statement obtained after the suspect was erroneously told by a childhood friend/undercover cop that he—the friend/cop, who had three children and a pregnant wife, would lose his job if the defendant failed to confess). Given this narrow view of a binding promise, confessions are rarely found to be involuntary on that basis. *See Braxton*, 112 F.3d at 782-83 (officer's statement that the suspect should "come clean," even if accepted by the court as an implied promise not to prosecute, was not coercive police activity); *Shears*, 762 F.2d at 402-03 (refusing to suppress a statement based solely on the defendant's alleged perception); *see also U.S. v. Villalpando*, 588 F.3d 1124, 1128-30 (7th Cir. 2009) (statements by an officer to speak with the district attorney and/or probation officer on behalf of the suspect "are merely offers of [] help. . ." and misleading police tactics, including "trickery" and "deceit" are permissible); *Green v. Scully*, 850 F.2d 894, 896-97 (2d Cir. 1988) (confession voluntary, even where police lied about evidence they had, expressed sympathy towards the

19

accused, and repeatedly assured the suspect prior to the confession that the person who committed the crime needed "help" and that spending "the rest of his life in an institution" with help); *Miller v. Fenton*, 796 F.2d 598, 601-13 (3rd Cir. 1986) (confession voluntary even though the officer assured the suspect he was sympathetic and just wanted to help, that he did not believe the suspect was a criminal who should be punished, and even lied to the suspect about the victim being alive when the officer knew she was dead).

Agent David's statements were not so much promises as they were opinions concerning the criminality of Hunter's conduct and how it would be viewed by others. While Agent David's repeated assurances that she understood how Hunter must have felt and that she (Agent David) believed the incident was an accident were no doubt persuasive and inducing, nothing in those statements constitutes a *quid pro quo* promise to Hunter in exchange for a confession. Based on all the facts and circumstances, the Court finds that that Agent David did not make a promise to Hunter that vitiates her confession.

    2.  Mental coercion

The defendant also argues that her statements to Agent David were involuntary because she was under "severe emotional distress." Specifically, Hunter points to Agent David's opening remarks that "[i]t looks like C.P. may be brain-dead or is on her way to being brain-dead." Doc. No. 46. The defendant also argues that she had been sleep deprived, that her erratic sleep schedule was something she and Agent David discussed, and that the timing of the interview (between 8:00 p.m.-11:00 p.m. with the re-enactment held after the interrogation) made the interview impermissibly coercive.

In the video, Hunter's reaction to the news of C.P.'s condition was immediate; she became visibly upset and began crying. Throughout the remainder of her interview Hunter

remained upset, often crying, sometimes to the point where she had difficulty breathing. There is

no doubt that Ms. Hunter was, at times, thoroughly distraught, appearing at times emotionally

out of control. However, there is no evidence that her emotional state was the product of threats

or coercion by Agent David or Investigator Hampton. *See e.g. Miller*, 796 F.2d at 603

(confession voluntary even though the defendant "collapsed in a state of shock" and had to be

taken to the hospital after confessing); *Green*, 850 F.2d at 899 (confession voluntary even though

the defendant was crying during his confession and a forensic psychiatrist testified that the

defendant had an "emotional collapse"). The record also does not allow the inference that for

various reasons (e.g., youth, lack of education, low IQ) Hunter was more susceptible to Agent

David's tactics than the average person. *See Vance v. Bordenkircher*, 692 F.2d 978, 980-81 (4th

Cir. 1982) (confession voluntary even though the defendant was fifteen years old with an IQ of

sixty-two, which an expert equated to a mental age of nine). Finally, the time and duration of the

interview are not so unreasonable as to permit an inference that Hunter suffered from sleep

deprivation to such an extent that it rendered involuntary her statements, and there is nothing in

her appearance or conduct during the interrogation that would support such a finding. *Cf. Reck*,

367 U.S. at 440-41 (finding impermissible that a nineteen year old with subnormal intelligence

was subjected for the first four days of his detention to six to seven hour "stretches of relentless

and incessant interrogation" conducted by teams of officers).

     For these reasons, the Court finds that Agent David's tactics did not cause in Hunter a

level of mental coercion sufficient to render her statements involuntary. In making this finding,

the Court has considered that Agent David told Hunter that C.P.'s doctors needed to know how

C.P. was injured for the purposes of treatment. Such a ploy, effective as it is to cause reflection

and remorse on the part of someone in Hunter's position, was not so manipulative as to

overcome Hunter's capacity to engage in critical self determination as to whether to provide the requested information.[4]

        3. Use of defendant's husband to coerce defendant

The defendant argues that her statements were involuntary because they were made only after she asked to see her husband, and that Agent David only agreed only in exchange for her cooperation, thereby making his presence in the room contingent on her confession. The video of the interrogation does show that Agent David and Investigator Hampton tried to convince Hunter to cooperate with them, without her husband's presence, after she had asked for her husband. Video 21:03. However, the video also shows that they continued to press her for information for only approximately thirty seconds before they brought Mr. Hunter into the room. Agent David's statement ("I'd like you to tell us what happened when we get him, is that all right?") simply repeated the request she and Investigator Hampton had been making throughout the interrogation; it did not sufficiently constitute a threat that Ms. Hunter would be prevented from seeing her husband unless she agreed to provide Agent David with the information Agent David wanted.

The defendant also claims that even though she was allowed to see and speak with her husband, a factor usually viewed as cutting against claims of a coercive environment, Agent David and/or Investigator Hampton manipulated Mr. Hunter into coercing his wife to make incriminating statements, as evidenced by the fact that "the first thing out of his mouth when he

---

[4] As courts have observed, "[b]ecause the police activity used to elicit an incriminating statement must be coercive before a statement will be held to be involuntary, it is not surprising that 'very few incriminating statements, custodial or otherwise, are held to be involuntary.'" *Braxton,* 112 F.3d at 786. Even in situations where an officer's statement influenced the defendant's "decision to confess, the voluntariness of the confession 'is not . . . to be equated with the absolute absence of intimidation,' for under this test virtually no statement would be voluntary." *Id.* at 783 (citing *Pelton,* 835 F.2d at 1072).

[came] into the room [was] "it's okay; you have to tell the truth." Hr'g Tr. 63:10-14. The Court

finds insufficient evidence to support this contention when viewed within the context of the

entire interview and Mr. Hunter's involvement in it.[5] While Mr. Hunter's insistence that his wife

"tell the truth" was no doubt helpful in obtaining Ms. Hunter's admissions, it appears to the

Court that he was acting based on his own assessment of Ms. Hunter's situation, no matter how

much he may have misperceived or misunderstood her legal exposure.

Considering the totality of the circumstances, this Court finds that Ms. Hunter was not in

custody at the time of her interrogation and that all statements made to Agent David at the NCIS

office were made voluntarily. Therefore, the Court will deny the Motions as to the recorded

statements made at the NCIS office on April 27, 2011. This ruling is, however, without prejudice

to the following admissibility issues: (1) whether evidence of C.P.'s prior injuries is admissible;

(2) whether evidence concerning the defendant's actions with respect to C.P., other than those on

April 26, 2011, are admissible; (3) whether the defendant's videotaped interrogation statements

pertaining to the events on April 26 may be admitted other than through the videotape; (4)

whether the introduction of the defendant's videotaped interrogation statements will make her

written statement cumulative and unnecessary, or vice versa; and (4) whether the statements that

Agent David and/or Investigator Hampton used to induce or encourage the defendant's

---

[5] Mr. Hunter was twice brought into the interview room to see Ms. Hunter. On the first occasion, Mr. Hunter took his wife's hand, told her to calm down, and asked her to tell him what happened. Video 20:53. Ms. Hunter then said that C.P. had fallen down the stairs prior to hitting her head, rather than just falling against a chair rail, as she had originally stated. Mr. Hunter then told his wife he understood she was afraid, but "this is what happens when you lie . . . ." *Id.* Given this exchange during the first visit, Mr. Hunter's insistence during the second visit that Ms. Hunter tell the truth is not particularly probative of defendant's contention that the NCIS agent pressured and programmed Mr. Hunter. Agent David explicitly denied any such efforts. No witness contradicted that testimony and there is insufficient evidence to establish any such effort.

statements must be admitted together with any admitted videotaped or written statements offered by the government.

C. Whether the video re-enactment is admissible

The defendant seeks to exclude her videotaped re-enactment on the grounds that it is not sufficiently reflective of what actually occurred, particularly, the sequence of events leading up to the C.P.'s injuries. Additionally, the defendant argues that in any event, any probative value is substantially outweighed by unfair prejudice.

In *Hinkle v. City of Clarksburg*, 81 F.3d 416 (4th Cir. 1996), the Fourth Circuit acknowledged the risks inherent in admitting videotaped recreations of events "because the jury viewing a recreation might be so persuaded by its life-like nature that it becomes unable to visualize an opposing viewpoint of those events." *Id.* at 424-25. In order to minimize those risks, the recreation must be "substantially similar to the actual events." *Id.*

The challenged re-enactment begins with Ms. Hunter sitting on her couch with a baby doll in her lap and Agent David saying "just do whatever you did that day." Video Recording of the Re-Enactment 0:07, April 27, 2011. After approximately ten seconds, Agent David tells Hunter "you don't have to sit there the whole ten minutes if you don't want to." *Id.* Hunter then laid the doll on the floor, stood up and walked to the bathroom, at which point Agent David told Hunter that she didn't actually have to go into the bathroom (as she did on the morning of April 26). Thereafter, Ms. Hunter carried the doll to the wall with one hand, as one might carry a doll, and shook the doll so that its head hit the thermostat on the wall. *Id.* at 1:26-48. The entire recreation video is 2:41 minutes.

The Court finds several incurable problems with the video. First, the re-enactment does not, of course, reflect in any way either Hunter's emotional state during the events depicted or the events or conditions that caused or contributed to that emotional state, all of which are

critically relevant to the *mens rea* element of the charged offenses. The re-enactment also departs in significant ways from the actual course of events as described by Ms. Hunter during her interview with Agent David. For example, the doll is smaller and weighs less than C.P. and the time involved in the sequence of events leading up to C.P.'s injuries is significantly shortened, depicting in less than three minutes what happened in approximately twenty to twenty-five minutes.

For all of these reasons, the Court finds that the re-enactment is not "substantially similar" to what actually occurred on the morning of April 26, 2011. The Court also finds that any probative value that the re-enactment may have is substantially outweighed by unfair prejudice to the defendant. Therefore, the Court will grant the Motions as to the re-enactment video filmed on April 27, 2011.

## V. CONCLUSION

For the above reasons, the Court DENIES defendant's Motion to Suppress Defendant's Statements [Doc. No. 33] and defendant's Supplemental Motion to Exclude Defendant's Statements [Doc. No. 46] with respect to defendant's videotaped interrogation statements and written statement on April 27, 2011, and GRANTS the Motions with respect to the videotaped re-enactment on April 27, 2011.

The Court will issue an appropriate Order. The Clerk is directed to forward copies of this Memorandum Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
December 14, 2012

25